Case number 17-S-475. FDR Corporation's petition to the Federal Election Regulatory Commission. Mr. Price is the petitioner. Mr. Banks is the responder. Good morning, Your Honor. May it please the Court. My name is Matt Price on behalf of Petitioner Exelon. This case is about presumptions. Under Section 205, a utility has the right to state the rate it demands for its services. And if someone thinks the utility should demand a different rate, they must first persuade FERC that the utility's rate is not just or reasonable. The scheme that FERC has approved for the New England capacity market turns Section 205 upside down. Under FERC's scheme, the utility must submit its bid, its demand, for review by the market monitor, who is a private contractor employed by the market operator, the ISO. The market monitor then reviews all the costs and assumptions that underlie the utility's bid, and it can reject the rate demanded by the utility and submit a different bid to FERC under Section 205. Counsel, may I ask a couple questions regarding your brief? On page 12, you say, if a plant's capacity market revenues are sufficiently high to cover the power plant's costs, less whatever revenue the power plant anticipates from other sources, the power plant would continue to operate. Didn't you mean plus whatever revenue the power plant anticipates from other sources? No, Your Honor. So the way capacity market bids work, essentially, is that the capacity revenue is designed to make the plant whole sufficient to recover its costs after accounting for revenue that the plant receives from other markets, such as the actual sale of its electricity. Yes, so why that would be plus whatever revenue the power plant anticipates from other sources, not less. No, because when the plant makes its bid, it says, okay, I'm going to get this much revenue from another source, and then this is the amount left that I need to recover in order to make sure I cover my costs, and that remainder is the amount that I'm going to demand from the capacity market. But economically, if a plant's capacity market revenues are sufficiently high to cover the power plant's costs, let's suppose they're not. Oh, are you saying they have to be adequate to cover the power plant's costs without regard to whatever revenue the power plant gets from other sources? No, Your Honor. So then that's got to be plus, because you're going to stay in business if you get $10 from a plant. Well, let me provide an example, and that would help. So let's suppose that my costs are $10, and I look forward and expect that from the actual sale of my electricity, I'll receive $5 from the energy market later on. Well, now I have $5 of costs that I haven't been able to sort of anticipatorily recover from the energy market, and so my bid for the capacity market will reflect that gap. So I've got $5 left. So $5 and $5 is plus, not less. Well, it costs the $10 less the expected revenues of $5 equals $5, which is the remaining money it needs from the capacity market. We're probably saying the same thing. I still think it's plus. Now there's another problem I have in your brief, which I think is almost a little slippery. You talk at one point in your brief, you refer to the burden of proof in 205 and 206 as the burden of proof, and in fact, the burden of proof is different in 205 than it is in 206, and your brief treats them as if they're the same. Well, I think what— It is true that they're different. What are— The burden of proof is on you in 205 and on the government in 206. That's right, but— And you suggested it was the same burden. Well, under Section 205, Your Honor, when we come in with a rate, we need to establish that it's just and reasonable. That's right. But as long as it's within the zone of— Well, no, I know that. I'm just talking about burden of proof. That's right. It's our burden of proof. Now in your brief, you suggested the burden of proof was on the government in both cases, and it's not so. The burden of proof is on the government in 206, but the burden of proof is on you in 205. That's true, except in this sense, Your Honor, which is that if the government doesn't—if the agency doesn't make any finding of unjustness— That doesn't go to the burden of proof. That goes to the standard. You misstated the burden of proof. Okay. Well, I apologize, Your Honor. Certainly what I mean is that under Section 205, the utilities rate, so long as it's within the zone of reasonableness, is accepted as a just and reasonable rate, even if it's not the most reasonable or the best or the most accurate under Section—unless there's— That goes to the standard, not the burden of proof. Fair ask, Your Honor. I don't understand the government to contest that it's advantageous for you to be under 205 and get the benefit of merely having to establish that it's within the realm of reasonableness. I agree, Your Honor. The government does not contest that. Maybe the government will have a chance to speak to that. Well, we're happy to provide the assumptions and methodologies that support our bid and our rate demanded and have that be subject to the commission's review. That's what we're asking for. There's another question I have about the brief. There's a dispute between the parties as to what happens in the situation. Your hypothetical, in which you bid 15, the monitor says 8 is all you're entitled to, and the clearing price is 10. That's your hypothetical. That's right. I paid you $722. Now, you said in your brief, under those circumstances, you're out. You can't any longer participate because the clearing price is below the bid that you put in. The government said not true. You had an option. You could have actually agreed to sell capacity at 10. I don't think there's a dispute about that. Let me clarify any misunderstandings. I'm sure it's all there's a dispute in the briefs. We're not out in the sense that we could go ahead and accept the 8. You said under the rules of the ISO, you're out. No, under the rules of the ISO, we could accept the 8. Wait a minute. Did you not say in the brief, under the rules of the ISO, you're out? I don't have it right in front of me, but I'm certain you said it. Well, I'm not sure which passage you're referring to. My explanation is that you could accept the 8, but the point is that it's way below. Wait a minute. Are you saying that... Unfortunately, I don't have the page in front of me, but I'm absolutely certain you said twice in your brief that under the rules of the ISO, you must leave the market at that point. Because it's way below our capacity. No, no, okay. Then you said you must leave. The government says that's not true. You have an option of taking the $10 price. Well, I think the passage you're on, Mr. Frank, is on page 21. You say, if the auction is run with that $8 proxy bid, the fourth and final bid selected in the auction will be the $10 bid, along with the $3 and $6 bids and the $8 proxy bid, and so we'll set the clearing price at $10. The plant would be forced to retire since $10 is less than the supplier's original $15 bid. What we mean by that is it's not what you said. Elsewhere, you said it's actually under the rules of the ISO. You had to, but you couldn't. Am I not correct? It may be. Okay, I see the sentence you're referring to on page 20, Your Honor, and that's... I apologize. That's not accurate. The rule is we can set the $8, but it's way below our cost, and so we will retire. So I read it the same way Judge Silverman did. So just to make sure we understand, you put in a retirement bid of $100, let's say, and the proxy comes in and says, no, no, an appropriate bid would be $50, and the market clears somewhere in between. Do you have or not have the option at that point of saying, okay, I know we bid $100, but on reflection and considering what the market monitor said and the proxy calculation, we're okay with $50. We'll take $50. We do have that option, Your Honor. Well, I noticed that flatly false statement in the brief. Well, I apologize. And I tell you why that was relevant, because it went to your injury. Hugely relevant. Yeah. Well, let me explain why that doesn't make a difference, because Section 205 applies to rates that we demand, Your Honor. It applies to rates we demand, and so not only rates we receive, but also... I asked about your injury. Well, our injury comes from the fact that we're forced to go ahead and submit a bid. Wait a minute, wait a minute, wait a minute. You have an option. You could buy at $10. But, Your Honor, that option presents us with the choice of either retiring or selling below our cost at a loss. That's not an option. You thought it was below your cost, but not the monitor thought it was below your cost. But that's the whole point of this case, which is who gets the... As long as our costs are just and reasonable, our costs should be given precedence and reflected in the supply stack of bids that go into the option. That's the point of the case, is that the market monitor and us may have very different... For purposes of standing, let's just talk about standing for a second before we get to the merits. I thought your best theory was this scenario that these rules could, under some circumstances, force you to retire a plant that you think is profitable. I don't see how that happens, given what you just told us, that you always have the option of adjusting your bid to account for what the monitor says and what the proxy bid is. Let me... I think the example on page 21 and 22 in the diagrams will help explain. Okay? In the example... Your Honor, you're being asked now for the injury, not the claim. I understand. Yes, Your Honor, and I'm going to explain the injury. So, on page 21, you see this is what the supply curve would look like. I'll be brief. I'll be brief. What the supply curve would look like if our own assessment of our costs were entered into the option. And you see that we would clear the market. We would be the marginal unit setting the market price that we would clear at a price of $15. But what happens under the ISO union scheme is that, instead, the market monitor has a different conception of what our costs should be and replaces our bid with a proxy bid. And you can see what that looks like on page 22. The proxy offer is D. So, it moves us from being sort of the market-clearing price of the market-clearing resource, the resource at the margin, to now being inside the supply curve. And the market now clears at $10 instead of $15. There was a buyer willing to pay $15 for our capacity, but now the market clears at $10. And because... Now, we could accept that $10 price, but accepting that $10 price means that we're out, under our understanding of our costs, $5. We're going to lose money. Why would we want to agree to a deal where we lose money? So, under that situation, we make the decision to retire our unit. That is our injury. So, your injury is an inferior injury in the sense that if you know that the market-clearing price is going to be determined by, essentially, the accumulation of proxy bids, at least it's going to be affected by the proxy bids, as well as bids that haven't been changed by the market monitor, you have to hedge what you do bid in light of that possibility, right? Well, certainly, the possibility, absolutely, that that process doesn't affect... So, it pushes you down, as you see it, to a lower place in the range of just and reasonable. That is true, too, Your Honor, yes. And that's happening for the entire period that this rule is in effect. That's true, too, Your Honor, yes. Yeah, I think it would be helpful to explain what exactly, more concretely, goes on when we submit a bid and the market monitor then reviews that bid. So, the problem is... Can I just ask you one nuts and bolts question, which is, how many of these bids are retirement delist bids as opposed to just bids? I don't know the answer to that question, Your Honor. Is it possible to just bid to say, I will sell X amount of... At whatever the planning price. X amount of capacity at Y price? That would be a different... I'm not threatening or raising the possibility of taking my plant out of capacity. That would be known as a static delist bid. It's a different kind of bid. So, retirement bids are one type of bid. Static delist bids are another type of bid where there's no retirement possibility involved. But under this scheme, the ISO and FERC wants plans to retire if they don't receive... Do we know anything about what percentage of bids fall into which category? In the market as a whole, I don't know, Your Honor. How about for your client? For my client, again, that information would be, I think, business sensitive. Fair enough. But the reason I ask is, if we're in a world where your client has only one plant that's on the very front end of a 50-year anticipated life cycle, the injury of... You might be soon making retirement bids, which might be skewed by the system and might cause an imminent injury. It seems a lot less likely than the opposite extreme where all or most bids are retirement bids and you have plants that are near the end of the life cycle. It just seems the standing is a little fuzzy here. I can say to you, Your Honor, that we do have several units that are near the end of their life cycle and are nearing retirement, including one where retirement is actually pending. And so this is... I mean, the reason I'm here and the reason we're bothering to bring this petition for review is because it's important to my client. I understand, but it is your burden to show standing, and we don't know a whole lot about the particulars of your client's situation. I understand that. And if the court would like me to supplement with affidavits after argument, I'm happy to do that. Obviously, standing wasn't contested by FERC, or we would have put in more information regarding those details. But, again, I think the point is you never know for sure whether you're going to get a marginal unit. That's sort of the problem, right? You sort of have to think, well, I'm an expensive plant relative to the market. How many plants do you have in the geographical area we're talking about? Less than a dozen, Your Honor, I believe. Less than a dozen? I think that's the exact figure for my client, but the point is that there are some major plants which are really nearing the end of their life. No, no, I understand. And these plants are relevant to our business. Before the agency, your brief suggested that you were not the only power plant that took the same position. There were other generators that also took the same position in the rehearing petition. That's correct, Your Honor. I'm happy to explain, if it would be helpful, how the bid, sort of the process works for the market model as you review it. That would be helpful to the court. I recognize that. You haven't explained it in your brief, I think. Is there something you haven't explained in your brief? I think the brief does explain the case. I was just going to sort of go through and explain the types of factors and the kind of reasonable business judgment that is involved in the submission of the bids in the market manner, such as what you think energy market revenues are likely to be three years from now, what you think, how often you think your plant is going to be out of service, whether you think that there are certain capital expenditures that you're going to need to make in three years, how long those expenditures should be depreciated over, what your risk of having a performance penalty is assessed on you, if you happen to be out during a cold snap or a very hot period, and also how you value risk, which is very important. And FERC recognizes how you value risk, the risk of things being not as you expect. And FERC recognizes that these range of assumptions can all be reasonable, and there could be the very objectives. Reasonable minds can get things done. Absolutely, and that's precisely why Section 205 gives the utility, the benefit of a rule, which says when they're reasonable, we respect the utility's judgment about the rate that emerges from those assumptions. So turning to the merits, is there any precedent for applying, for treating as a rate demanded under Section 205, not the end result, not the rate that is the end result of an auction or a negotiation, but as it were, an opening bid? Well, in terms of cases, I don't think this issue has been litigated before, but I would just point to the Court's statute, which says all rates and charges made, demanded, or received by any public utility. So the amount paid by the auction is the rate received, but the statute... I understand your textual argument, and it's a pretty good one, but it does seem inconsistent with how the system operates. Well, I don't think so, Your Honor. I mean, take a case. Suppose we're in mobile Sierra territory, and you just have two parties negotiate, a buyer and a seller negotiating a rate, and they're sophisticated parties, right? And the seller thinks the high end of the just and reasonable rate is $100, and that's where I want to end up. So I'm going to make an opening bid to my opponent. I'll sell it to you for $120, and that's as part of a negotiation strategy to end up at $100, and let's assume $100 would be the top of the just and reasonable rate requirement. Does anyone think that that opening bid of $120 violates Section 205 because it is a rate demanded that is not just and reasonable? Well, I think that... I don't know that that's come up before either, Your Honor. That's the import of your theory. Well, I think it would be. It would violate. I mean, it could be reviewed under Section 205. FERC could take disciplinary action. FERC could take whatever authority they have against someone who negotiates in that way. I would imagine so. I don't know that that's ever been... Has it been reviewed at all until the parties reach a contract? Well, no, because Section 205 involves the submission of information to FERC for FERC then to review, and so the kind of negotiation you're talking about happens outside the context of FERC which is actually looking at supporting documents and assumptions and methodologies to support what's submitted to it. Now, I think what... It suggests to me that rate demanded might be the rate that's settled on at the end of the negotiating process rather than something at the beginning. Well... It's just another way of expressing FERC's input theory. I don't think so, again, because that would also be the rate received, and so the statute obviously covers both and must have meant different things by both, but the other point I'd make about that is that FERC itself recognizes that these bids are submitted to it under Section 205. I mean, that's the problem here in a sense, that these bids are submitted in a Section 205 filing, and so there's, I think, an internal contradiction in FERC's argument. How can these bids be submitted pursuant to Section 205 yet somehow be outside the scope of Section 205? I think your answer to Judge Patz's hypothetical is that the negotiating position would not be a demand. That may be one way to put it. I mean, a demand is something that's actually filed... Section 205 covers the things that are filed at FERC, and so a negotiating demand that's happening outside that context wouldn't constitute demand in that sense, really. It has to be right, otherwise your whole case would collapse. Yeah, no, I think a lot of other things would happen. It'd have to be FERC review of every step of negotiations between a supplier and a buyer. And FERC interference in that process in a way that's inconsistent with the whole idea of bilateral negotiations. So why isn't the bid that we're talking about here more akin to an opening offer rather than like in a traditional tariff filing or Mobile Sierra, just the defiled rate? Well, because in this case there's no negotiation. I mean, the bidder has every incentive to offer what in economics would be known as its reservation price. That is the minimum it's willing to accept for the product. Otherwise it could end up offering too high and then discovering, oh, whoops, the auction ended up clearing below my bid. I wish I had offered lower. So the bidder wants to do that, and so the bidder has every incentive to offer its true assessment of the minimum it needs in order to remain in service. Your position would be, excuse me, Judge Cassius, your position in response to Judge Cassius would be a lot stronger if your brief was correct rather than false with respect to whether or not you could continue to enjoy the clearing price if it was below your opening position. In other words, the way you wrote the brief would have had a better answer to Judge Cassius than the fact of the truth because as it is, your bid, which is your opening position, is not your final position even as demand because you could, yes, the second rate, which is below your opening bid, can also be thought of as both the demand and the receiving price, right? Well, no, Your Honor, and again, I apologize about that. You had two demands. You had two demands. The first demand was rejected by the monitor. The second demand has been accepted. No, we have one demand. Then the market monitor replaces that demand. Hypothetically, you had a second demand too, didn't you? No, it's not our demand. It's the market monitor's demand. And it's true that the market rules allow us to essentially keep that price if we have some sort of second thought about, well, maybe our costs are actually lower. But then it would be a demand, wouldn't it? Well, in that case, it would be a demand, but we're not going to make that demand because it's below what we think our costs are, or we wouldn't have said. In our example, we wouldn't have said our costs are 15. That's what we want. It's a practical matter. It would destroy your credibility if you did. No, it's not about a practical matter, Your Honor. It's about our assessment of all these factors involving business judgment that involve reasonable disagreement about how to value risk and what the future will hold in terms of prices. That informs our bid, and that's our understanding of what our costs are. And if the market clears below that, we don't want to accept. We'll retire. That's the whole point of offering that bid. So the fact that we could accept a lower market clearing price that results from the inclusion of the proxy bid is cold comfort. It doesn't help us because it's below what we subjectively understand our costs to be. And if our subjective understanding is a reasonable one, this statute requires that it be accepted without regard to whether the market monitor thinks differently. And that's the fundamental issue in the case. Can I ask another nuts and bolts question? My understanding of how the auctions, the ISO, actually asks suppliers, and I can't tell if this happens all at once or iteratively over time, but the ISO asks a series of questions to the effect of how much capacity are you willing to sell at price number one, price number two, price number three, et cetera. And when you bid on this, you say, well, I'll sell 100 units at 100, 90 units at 90, 80 units at 80, and so on. Right? Is that a fair summary of how things work? Roughly. My understanding with respect to retirement bids, the bids need to be announced in advance to the market monitor. That's the whole premise here. The bids need to be submitted in advance to the market monitor and reviewed. And so they're announced in advance of the auction. But if the bidding works in that way, under your theory, why wouldn't all of those bids, why wouldn't all of those numbers be bids offered? I'm sorry, rates demanded. I'm sorry. Your client says, well, I'll sell 100 units at 100 and 90 units at 90 and 80 units at 80. If rates demanded just means any number that the seller tenders in the course of doing this auction before the market clearing price is established, it would seem to cover all of those. If those offers are indeed then submitted to FERC in a filing of some kind, they would be rates. Yes, rates demanded. Perhaps I'm not understanding. This would occur in a case of multiple plants or in a case in which, depending on the level of production, the cost and therefore the rate demanded would be different layer by layer. I meant the latter. Where the cost of production would be different layer by layer. Is that the hypothetical? One plant, how much are you willing to supply? And your answer depends on the price. You get different answers depending on the price. Because there might be different marginal costs of production, different price levels. Yes, you're willing to sell more as the price goes up. Each of those would be rates. Yes, you are. Each of those would be rates demanded for that quantity of capacity. That's correct. And therefore, each would be subject to 205. Not just 205 protection, but 205 restrictions, which is that each of those has to be just and reasonable. Well, the way FERC handles this in the ordinary course in these types of markets is that sellers have market-based tariffs, which is essentially ex-ante approval that allows them to make whatever offers they like in the context of a market, assuming that competition disciplines those offers and prevents the exercise of market power. So, yes, they're all subject to Section 205 in the sense that they're all authorized in advance by a market-based tariff that allows these bids to be made without actually having to go to FERC and submit your bids for FERC to review. Are there no further questions or anything else? Okay. We'll give you some rebuttal. Okay. Good morning. I'm Carol Vance for the Commission. I definitely want to get to the retirement options, but I think it would be useful for me to start with the nuts and bolts. In this market, there are certain administratively determined benchmarks that are FERC-approved in advance. They're in the tariff. They're based on cost of new entry, and there's a benchmark. I don't remember what it is right now. When the market started, it was 0.8 times the cost of new entry. It's changed every three years, and this court has dealt with that in the 2014 New England Power Generators case. The benchmark is sort of the opening price for the option? Well, they're kind of guardrails. It's a benchmark below which we're not concerned about potentially non-competitive behavior. Now, there's a minimum offer price rule. There are floors and ceilings for different kinds of bids. All of it is administratively determined. When you use the term benchmark, it would be nice if you explained what you meant. Okay. I'm sorry. It's a threshold. It's a threshold. If you're looking to bid below that threshold, no one will ever look at that. It's called the dynamic deal list. You're free to do what you want below that threshold. So, if a bidder comes in with a retirement bid below that threshold, there is no risk of a market monitor snooping around and saying, no, no, no, I think it's really low. The tariff specifies that bids under the dynamic deal list thresholds are not subject to this review of retirement bids. Now, that begs the question, who's going to go with a retirement bid when they could just do a dynamic deal list and then jump out of the capacity market that year if they're not satisfied with the cost? Now, once you make a retirement bid, you are bound to stay on a retirement track, so you have to keep putting in a retirement bid every year unless you're given permission to get off of it. I do believe that some of the subsequent retirement bids, even under the dynamic deal list threshold, may be subject to review. I'm not sure about that. It hasn't really been contested here. But certainly your first time you make a retirement bid, if you're under this dynamic deal list threshold, nobody needs to look at it. You don't have to tell anyone what it is. The market monitor will not look at it. No one will know what your bid actually is because, unlike in some other regions, they bill the supply stacks from the bottom. You mean the bids are not disclosed to all? Under that threshold, no. No. In other regions, in the position... No, they might be. But the reason is because of how the market works. In the PJM region, in the mid-Atlantic and Midwest, you build the bid stack from the bottom. And you know all the bids in advance. The system operator has all the bids that are raised from the lowest to highest, uses the demand curve, and builds the bid stack. In New England, you start with everybody in. All qualified generators are in. The starting price is very high, maybe two times the cost of new entry. And you go down the demand curve, and people drop out. That's why it's called a B-list. Once you get to the dynamic... And it is done as a single option. And to go to your unit question, my understanding is you bid in a resource, like a power plant. You don't get to say, I'll sell all of it at this price and half of it at this... I believe you bid in each of your resources. And everyone's in the market. And as it drops down... So, above the dynamic B-list threshold, to have a bid at that level, you have to be market monitor reviewed. The most common one is static B-list. For a retirement bid. Well, those two. But the more common one is static B-list. I don't have numbers on that for you, but I did... Static, the list is what, ma'am? That is... I want to drop out of the capacity market for this year only if I can't get X dollars. Oh, in other words, it's not a complete retirement. No, no, no. But it's a removal of capacity. And it has existed from the start of the market. That's why the commission said that this process... The commission thought this was just using a process that already existed for the static B-list. And, in fact, that one's more rigid because you don't have the options that I'll talk about. If you don't like what the market monitor has done... Well, when the market monitor says you haven't justified the costs for your bid, you can withdraw the bid, or you can accept the bid that the market monitor thinks is right, or you can unconditionally retire and just get out of the market. So you actually have... Can you accept the clearing price? No, no, no. And that's what I was saying, too, with the retirement options. You do have to make your election in advance. The market monitor reviews your retirement bid, says, actually, we think that this one cost input you haven't adequately supported or you haven't valued the risk in a way that's reasonable... You never, in this scenario, get a chance to have the commission review your bid under the standards of Section 205. Well, the independent system operator puts in the filing with all of the bids, and the system operator itself said, we'll include the original bid in their documentation, too, because the burden that the system operator has to meet to justify what the market monitor has done is to show, number one, there's a materiality threshold. So the market monitor... Which is 10%. 10%. And if the market monitor comes in at 10% or greater... Then the original bid, unmitigated. Then it goes to FERC with the... Original... Proxy bid being... There would be no proxy bid if there's no 10%. No, and any time it's greater than 10%, it goes to FERC in a posture where FERC is supposed to treat the proxy bid as the... I'm not sure I get the terminology right, but the one covered by Section 205. Well, a couple things on that. I want to be careful about using the word proxy bid because although the market monitor comes up with what the correct competitive bid would be, the proxy bid is what the market monitor is going to put into the auction to prevent the supplier's bid from influencing the... Potentially influencing the clearing price. It appears that the market monitor's bid is for this particular plan. The bid that it thinks is just and reasonable. But it's... It's not about the total effect on the market. No, no, no. It's not about the total effect on the market. And I would point you to... Particularly in Rehearing Order Paragraph 18 and 19 on J.A. 224, this is where the commission talks about... And there are many other places that that's the most pointed place. The market monitor, which is a department in New England. It's not a contractor. It's actually an internal department. There's an internal and an external market monitor in New England. All these markets are a little different because they all were able to develop in their own ways. The internal market monitor makes the determination. The system operator makes the filing. And you're right. This is a 205 filing. But to do a mitigated bid, the market monitor has to show that not only the 10% materiality threshold, but has to show that a specific cost input... See, this isn't just a number you come up with. There are specific costs laid out in the tariff that you're allowed to put into your bid. And the market monitor has to show a failure by the supplier to substantiate some specific cost item. It's not just this number doesn't look right or we don't like what it would do to the market. And FERC looks at that. Yes. And what are the standards by which it evaluates this? It wants to find the right number. It says in paragraph 18 that nor do these tariff changes oblige the commission to accept, as just and reasonable, an internal market monitor mitigated bid in lieu of a more accurate supplier initiated bid. And actually the... Well, more accurate. Maybe it turns on the... Well, but if you read further... Lurking in the phrase more accurate. Because the question is, in addition to the materiality threshold, did the supplier fail to support with adequate quantitative analysis, adequate documentation? Did it put cost into its bid that it couldn't support? Are you saying that this review process is exactly the equivalent of a section 205 review of... No. No. So what is the difference? The difference... It sounds as if you're saying, no complaint. These suppliers are getting exactly what they would normally get. Well, they're getting exactly what they always got with the informational filings and the static D-list process, for example. And we cited a, I think, 2015 case. Well, counsel, I am getting totally confused by your presentation, which goes beyond the brief, perhaps. If I understand it correctly, and this is what I did understand from the brief, the market monitor disputes the supplier by at least 10%. So then both bids go before the FERC at that point. The bid of... This is important. The bid of the supplier hasn't disappeared. It appears before FERC. And FERC has... One of them is called the proxy bid, which is the... Which is proxy?  No. Just follow me. Okay. Which is proxy? The original supplier bid or the monitor bid? The monitor's mitigated bid would be a proxy if they need to put... Yes. Okay. So both bids come before the agency, right? And the agency gives the monitor's bid priority in the sense that if the monitor's bid... It is the bid that is considered. No. No. Because the commission and the tariff rules... The commission says it has to comply with the tariff rules, and the tariff says specifically you cannot mitigate the bid that the supplier failed to substantiate... Yeah, but so what? That's not inconsistent with what I said. You said no. Well, it's not just... What is it that I said was wrong? If both numbers were just unreasonable, if we're saying they're both in a zone of reasonableness, that's not enough. What's not enough? That is not enough for the monitor's bid to prevail. The monitor has to show a failure of a specific cost input, not just we don't like these numbers, not just they might affect the market in a certain way. In paragraphs, I think 58... No, no, no. What you're suggesting is the monitor has to show why it rejected the supplier's bid. And why it can supplant it with a particular... Yes, I understand. So both bids come before the agency. Yes. All right. And the agency examines but gives priority to the monitor's bid. Well, I don't know. We don't... It's just unreasonable. The commission never refers to priority, and it says you can only do this if you show a failure in the supplier's bid. Not all bids are equal, right? So we want to find out whether a supplier's bid will lose out to the proxy bid under circumstances where the commission takes the view that both are just and reasonable. If... And the commission doesn't phrase it that way, that they're both just and reasonable, because it doesn't... But it only happens if there's a failure of the supplier's bid. You know, you're using the term failure as if it was a binary question. A is a failure, B is not. Yes. Well, there's a range of determinations on cost, right? No, but not here, because the monitor cannot substitute its own particular cost item for the particular cost item that it's supplying in the mitigated bid without showing that the supplier did not support with documentation... You're heroically resisting my question, which is, suppose that the commission would find the supplier's bid to be just and reasonable. Then it would be supported. It would be supported by documentation. But that isn't the task that the commission applies. Oh, it is. It's the tariff rule. It says it has to comply with the tariff, and that is the tariff rule. The tariff rule is that you have to support all of your cost items adequately. If it finds it's adequately supported, then it's in compliance with the tariff, and the supplier's original bid is what goes. Suppose we were in a normal Section 205 context, whatever that is, and the supplier has a rate that's been filed with FERC, and someone, a challenger, a customer, whoever, wants to come in and say that that rate, which only has to be somewhere within the zone, is unjust and unreasonable, and the challenger comes in and says, my argument for unjustness is fill in the blank, and the blank is what you just said, which is there's some specific component input of the rate that's not adequately supported. Would that be enough to establish that that rate is outside the range of reasonableness, if FERC agrees? No, and that's exactly why these things are different, because these bids are put into the option. So then what happens in the 205, and what I loosely call the normal 205 context, is more favorable to the supplier than what happens to the supplier here. Because that supplier is actually trying to set a rate. It's not putting a bid into an option that has... We understand that. We're trying to get the aspect of the process that you're conveying to us, and you seem to be saying, well, it's just as good for the supplier as the regular level of assessment, whether its proposed rate is just and reasonable, but could you explicitly resist a characterization of it that way? Right. We're absolutely baffled as to how what you're saying, accepting it as completely true, changes or undermines the petitioner's plan. Well, it builds on several parts of our argument that these bids are not... First, the bids are not rates. They're inputs into the option. And that's the argument I was pressing on. I get it. There's a legal argument that this kind of bid is not a rate. Right. But if you lose on that, you seem to be making a separate argument that the process the bidder gets before FERC in this context is no different from the process a bidder would get in another 205 context. And I think that's what's going on. No. Right. We're not saying that. I mean, it's actually a more flexible process. We're not talking about flexibility. We're not talking about flexibility. We're talking about priority. We're talking about the standard applies to the supplier's bid. Right. Well, no, I was talking about the standard supply. What does the FERC look at first? The monitor's bid or the supplier's bid? If it's been mitigated, I guess it looks at them together. But I suppose it looks at the monitor's bid first, but the monitor has to show why. I understand what the monitor has to show. Yes. And then is it fair to say that if the staff says reasonable men could differ as between these two bids, right, or women, who gets priority? Well, if reasonable minds could differ, first of all, they should be within 10%. I think the supplier. Because if the supplier is able to support the particular cost items in such a way that the commission says reasonable minds can differ, but you have supported your version, then yes. That's exactly what the tariff says. If they can support with – if they can quantify risk, if they can put in supporting documentation and analysis, then yes, the supplier's bid. Do you know where in the Joint Appendix this is? Because at least I certainly didn't see your brief as making a claim remotely like this. Well, I mostly look at 18 and 19 in the recurring order. It's also – Okay. And what language there? Well, the part about not being obligated to accept the market monitor's bid, it goes on to say as being – just because it's being filed by them. In the last sentence of paragraph 18, the market monitor can only mitigate the bids that fail – where the supplier has failed to support the reasonableness of a particular cost item. The only way we get to the hypothetical that you just posed where reasonable minds can differ and either one could be right is if in fact they didn't fail to support the reasonableness of their bid. If they actually did put in supporting documentation and analysis – Where in paragraph 18 are we? This is paragraph 18 of page 224. It's in paragraph 18 on page 224. Okay. But there are other places that we – Well, but you – I didn't see in a quick look the language you were talking of. Oh, it's the next to last sentence. The revisions permit the monitor to propose to mitigate only those supplies that exceeded the materiality threshold and failed to support the reasonableness of particular cost items. And I would look also at JA 175, paragraph 58 in the initial order, the tariff order, which is describing this process. Which paragraph? It's paragraph 58 on JA 175. Counsel, we're going to put this simple question to you. In the event that there's a dispute between the monitor and the supplier, are you perfectly happy with the proposition that the supplier gets – if the supplier is determined to be just and reasonable, it satisfies its burden? If it supported all of its cost items? No, no. I'm going to the legal question. If the supplier is determined to be just and reasonable, does it get its rate, whatever, regardless of what the monitor said? Just and reasonable has to have a meaning. And just and reasonable has to mean in this context that it's supported by its cost. Well, of course. So it's the same thing. What you say is correct. Right. In principle, there's no dispute at all between you and the petitioner. Exactly. But this particular standard should be modified to say, failed to show that its rate is just and reasonable. And you conspicuously don't say that. Because the commission has held previously in a case that's not a dispute hearing, in a 2011 case that was upheld on other grounds, it wasn't challenged on that basis, the 2011 order that we cited, the Devon Tower 2011, that the petitioner never even discussed, which was upheld by this court in one of the New England powers, I think, 2013, has never said that your bid is a rate. Because the rate is set by the auction. This court is not including the auction. You're going back to the purely linguistic argument. I think we understand that. Well, it's not. But here you're making a pragmatic argument, which is that everything works out just the way the petitioner would like it to work out. The petitioner doubts that. The language doesn't seem to completely agree with that. So the orders, I mean, I'm not really saying it's in the orders, in that the orders said numerous times we've always viewed this as being essentially the same process that is already used for static D-list bids. The commission didn't think anything new or unusual. Well, I don't think that solves the problem. Static D-list bid is different. The question is what is happening here. And permanent D-list bids, which are now handled this way, were also extant. They also existed in that earlier process. But the commission thought this was the same process. So what I'm saying, I think what I'm saying, too, is not strange from what the commission said. Well, here's a puzzle in me. You're suggesting that the way you look at the supplier's bid in this process, in which you're comparing it to the monitor's bid, you're treating it exactly as if it was a rate. So I understand your language. In other words, your practical argument is different from your linguistic argument. Your linguistic argument is different. And yet you're analyzing it just as if it was a rate. Right? Well, yeah. The bids have standards of the cost that you pay. You are analyzing the bid just as if it was a rate. I think the difference is that there's, I don't think so, for one thing. Well, you just explained it. You said, look, we have to look at this. We have both the monitor's proxy bid, or one of them's a proxy. You've got me confused. I know. I didn't get back to that. You have both the monitor's bid and the supplier's bid. And you look at them, but at that point you're looking at rates, right? The monitor's rate demanded is X for the producer, and the producer's rate is his bid. So you have two potential rates. Certainly the analysis of the cost is similar, but the commission does not consider it a rate because it goes into an auction mechanism. You got it. You got it, ma'am. What we're trying to say is you've explained the process of analysis as just as if the supplier's bid was a rate. It is similar. It is similar. It is. So then your linguistic argument then is sort of irrelevant. Well, it's not. We think it's not linguistic. It's functional. It goes to... The linguistic argument being the change between bids and rates. Well, I don't think it's really linguistic. I do think it's... Well, I don't mean to be... Really, it's linguistic. But you've explained that your process of analyzing it is exactly the same, as if the bid were a rate. Okay. Now, where is the difference between the two of you then? Did you suggest that the monitor's rate will not be accepted if the supplier's is just and reasonable? If it has supported its cost items as required in the tariff, yes. If it's... The supplier's rate... The supplier can use their original bid if they have supported all of the cost items as required... Well, that would be true of anybody who filed a tariff, right? I think there might be other things that go into some other... I don't know. There's no doubt on this. It conspicuously talks about particular cost items. Suppose the market monitor identifies five cost items which it believes have not been adequately supported. And suppose the commission... The commission would look at all five claims. Is that right? And suppose it found that one wasn't adequately supported, the other four were. Then what happens? My understanding of how the process would work is it would go back to the ones that were. I mean, it would go back to the supplier's cost items that were supported and put those back in. Yeah. And I think if you're not outside the 10% threshold... Let's forget about the 10% threshold. Well, then... That is complicated. It wants to find out whether they've supported their numbers. So if... Did you say four were supported and one wasn't? Yeah. Yes. Then the four it supported would go back into the number, the one that... So are you saying what happens here is the exact equivalent of what happens when a rate is submitted and it is reviewed against various claims that it's not adequately supported and the commission finding that some of it isn't adequately supported will then say, No, you're beyond the range of reasonableness and we would only approve a rate of 12% lower. I guess it's similar, yes. I think it would... If I'm understanding your question right, yes. Yeah, well, I guess... I mean, I think... That results in this being a tempest in a teapot and we're trying to... Well, it may be. It may be because the commission really with this was looking at market rules that were setting up a new kind of price retirement bid that's not that dissimilar from the static dealers' bids except you can put more costs in it, you can put capital costs and going forward costs. The commission really thought it was looking at the same thing it's been looking at all along. I know I'm out of time. I want to make two very important points. To put some numbers on Judge Katz's question, I don't know how many static dealers' bids there are in a given year but I looked at the retirement dealers' filings that have been made in the first few years under this. There are no details in them because they are filed confidentially because of all the proprietary information but there have only been a handful of the retirement bids that were mitigated each year because there have been like a dozen. Given all of that and given the obvious confusion about how this actually works, do you want to rethink your failure to contest standing at all? Well, of course, if it's Article 3, we can't concede it. We don't contest it in every case. Do you think that standing is satisfied here? No, I wouldn't concede it but I don't have an argument to make on it. But one very important point because there was so much confusion about the retirement options and this is very important because we're talking about when the petitioners talk about the price that they demand for services to be provided with their assets, there is no supplier would be required to provide service with its assets anything less than its original supplier bid. Yeah, well, that's undisputed. Okay. But I do want to just be clear about that. They do have to elect students. They aren't allowed to do it after the clearing crisis. I think they would say after the auction is run. Oh. They do have to decide in advance. So after the auction is run, they can't… They always have to decide in advance. With unconditional retirements, now they have price retirements as well. They always have to decide in advance. Out of static dealage bids, they have to decide in advance. You don't get to decide… What about the retirement bid? With retirement bids. They put their bid in. The market monitor tells them, we don't think you support this cost item. We're changing your number to X. You have a period of time to choose three options. You can unconditionally retire to say, I don't care. I'm done. You can conditionally retire, no, I bid $10. You say that it should be $8. I'm standing on my $10. And that is… Well, you're not standing on my $10. I have to get my $10 or I'm… Well, that's the same way of saying I'm out. Well, no, because you don't yet know. The auction is well before the auction. Oh, I'm sorry, I'm sorry, I'm sorry. The auction runs, and the auction… And that's why there's a difference between mitigated bid and proxy bid. You can say, no, I'll take your mitigated bid. If you don't, and you stay… Why didn't you disagree with them in their brief then? Why didn't you say they had their brief wrong when they said… Well, we did say in our brief that you always have the right to conditionally retire. I think I didn't understand until today that anyone was talking about making that determination after the clearing price was known. That's the only thing I'm correcting. But with proxy… Because it's not always, right? The adverb always doesn't fit there. Wait. Always which? I'm sorry. But to be clear, the proxy bid is if you choose to unconditionally retire or to conditionally retire at your $10. The market monitor doesn't put your $10 in the market, but you're there with it. They put the bid in at $8 so that you can't influence other… No, we understand that. Okay. But, so the market closes… No, I want to make sure I understand it. The market closes at $10. Your bid was $12. Can you take the $10? No. You have to decide in advance. You have to… And that is… That was what they said in their brief, and then they retreated from that. I think I didn't see that they were saying that they could elect after the clearing price was known. No, they said they were stuck, and then I… Well, that's why we said in our brief that you're not. On page 32, we said that you can conditionally retire, and you're not… Yeah, but they are stuck if they can't move after the bidding process is over. Only if they elected to take the mitigated bid, and that's exactly the way it is with static delist bids that have bids. That's before the auction. Before the auction. After the auction, they don't have this choice. That's right. They have to make an election early. And so you've given them a better argument for standing than they make. I just want to be accurate about… I know, I know. But to be clear, no supplier is ever required to supply at a price that they didn't agree to. There's no forcing. So they bid $10. Yes. Market Monitor says no, it's $8. We think it's $8. That's right. At that point, we're still pre-auction. They have three choices. They can elect to just retire regardless. They can elect to maintain their initial bid at $10. That's right. Or they can adjust their bid and take $8, and then that's what goes into the auction. Well, the $8 is going to go in the auction regardless. Right, right, right. If they unconditionally or conditionally retire, the $8 proxy bid is kind of a phantom bid. There's no supply with it. So they stick at $10. Yes. And then the auction happens. It clears at $11 million. And the clearing is at $9. It clears at $9. They can't at that point say, no, we want to go to $8. No. But neither can any other bidder. No. And you could have a little process. If you didn't like what the market monitor did with your staticy list, or if you did unconditional retirement, it's always been the case that you do have to make these decisions in advance. There's no gaming the auction as it happens. It has to be done in advance. Now that we've cleared everything up. I'm sorry. I created more confusion. Thank you. Any other questions? No, I don't think so. Okay. We'll take some rebuttal. So I would like to make three points, if I could. The first is picking up on Ms. Blatt's exchange. And your question about her brief, Joe Silverman. I've now had the chance to go back and look at the passage. It is accurately stated for the very reasons that Ms. Vance explained. I think we had a disconnect about when things were happening and timing. So the way it works is. Yeah, she did not make that clear. She preserved your position by pointing out that after the auction takes place, you cannot then take the clearing price. That is absolutely right. So that suggests there's a stronger argument for your standing than the one. That's right. Because we're stuck with whatever the auction price turns out to be. And if it's below our costs, we will retire. Under the rules. Yeah. If we stick with our own original bid, and the auction is then held. The difference between the two of you was a timing problem. A timing question. She clarified that the timing is that we get to choose only before the auction happens. Now, what about this discussion we were having concerning what practically happens? Do you get the impression? Do you understand there's really a big difference between the situation they're now pursuing and what they were pursuing before? You made it in your brief turn on the burden of proof. Well. But it's sort of sound. I understood them. Ferk was saying that if your position is just and reasonable. That is to say your costs are supported. Your bid is accepted. I did hear that. And I'm glad to hear it. Although I have to admit I'm a bit perplexed by it. Because this was the subject of the rehearing petition. And Ferk's order doesn't really say that. And our understanding of what Ferk said in his order is that it's our job to come in and protest the market monitor's proxy bid. So it gives the section 205 preference to the market monitor. No, it didn't say that. You assumed that, right? Well, if you look, for example, at paragraph 70 of the, let's see, paragraph 85. It says that the filing provides suppliers an opportunity to challenge any proposed mitigation before the commission. In other words, it's the supplier's duty to come in and challenge the market monitor's bid. Well, that could be true even if you had the burden, if the burden was on the monitor. I mean, I suppose that. Because in a normal 205 challenge, suppose a challenger comes in on a 205 filing. Who has the burden? The supplier would have the burden of showing that its rates are just and reasonable. That's right. So if you look at paragraph 19 of the rehearing order, that's exactly what's going on here. And does that include the burden to show adequate justification of the particular cost inputs? I think it's ultimately about the ultimate rate, Your Honor. And so the sort of cost inputs would bear on the reasonableness of the ultimate rate. But you can imagine a situation where perhaps there might be disagreement about a particular cost estimate, but that disagreement didn't place the rate as a whole outside the zone of reasonableness. Now, if you look at paragraph 19 of the rehearing order, it says, in explaining why this complies with section 205, it says the proponent of the 205 filing, as the proponent of the 205 filing, ISO New England will bear the burden of proof to show that any proposed mitigated bids comply with the tariff and are just and reasonable. So that suggests to me, and this is the premise of our petition for review, that the ISO New England Read it again.  The ISO New England has the burden of proof to demonstrate that its proposed mitigation bids are just and reasonable. It's exactly the 205 process. Correct, except the ISO New England Are saying that the market monitor is substituted for the supplier for the operation of the 205 process. Exactly, and so You would say it unequivocally. Yes, in paragraph 19 of the rehearing order. And so, in other words, the market monitor's bid is the one that gets the presumption of, or the rule of priority under section 205, and it's our burden to come in and show that it's not just and reasonable. That's the problem in our case. If the commission is now suggesting otherwise, we're happy to accept that concession, but we'd really appreciate an order from the court making that clear so that there's no misunderstandings on the floor. And I guess I would like to ask the, when he asks the surrounding judge whether we could hear again from Clark's lawyer. I have the same thought. You have the same thought? Okay, well, if there are no further questions, I'm happy to take them. Thank you very much for your time this evening. Ma'am, you better be careful on this one. Okay. Now, if the rule of priority remains on the supplier, then this is a tempest in a teapot, and we really don't have a disagreement. The commission has never referred to this as rule of priority, so we... Well, except for the normal section 205 filing. A supplier files a tariff, and it's accepted if it's just and reasonable. Right. Correct. Now we have a market monitor who disagrees, right? The market monitor disagrees more than 10 percent, so it puts in another proxy bid, or whatever we want to call it. And now the question is, assuming that it's possible, and we really do see it's equally possible, if both are just and reasonable, reasonable men and women could differ, who gets priority? The commission said in its order, and the system operator said from the beginning of its filing, that if the supplier has supported its cost items as required in the tariff, it will not be mitigated. And the commission said specifically in its order... I don't think you're answering the question. ...that the market monitor doesn't even get to mitigate it. I don't think you're answering the question. I don't know how to answer it. There are two different calculations before a tribunal. Theoretically, both could be just and reasonable. Certainly that's true, theoretically, right? If they're both supportive, the supplier gets to keep the original bid, yes. So this sentence in paragraph 19 is at best confusing, and at worst mendacious under your view, because it ought to read, but as the proponent of a rate, the supplier will bear the burden of proof to show that its bid is just and reasonable. Period, full stop. Right, but it can only be read in conjunction with paragraph 18 and other parts of that order and the previous order that say the market monitor's bid is only compliant with the tariff. It only is permissible under the tariff if two things are true. Would you have any objection to our ruling in your favor, based on your representation to Judge Williams, that the words he read to you should be interpreted or rewritten to mean what he said? It's not ISO's burden to show that the mitigated bid comply with the tariff and are just and reasonable, but it's the bidder's burden to show that it's, the supplier's burden to show that its bid is just and reasonable. And if it is, that's it. Right. Necessary and sufficient for the bidder to prevail. I think that's right. I only have two hesitations about that. One, if they conditionally or unconditionally retire, the market monitor still has to justify the proxy bid to the commission, so the market monitor still bears a burden when there's no dispute. The supplier shows that its bid is just and reasonable. You have just said, we understand you have said, its bid is the bid that goes into the auction. Right? Period. Full stop. Forget about it. If it chooses to unconditionally retire, I think that's right, but there are cases where the market monitor is putting forth a proxy bid that's no longer in dispute because the resource decided to retire. Well, that's not relevant. Yeah, then the case has disappeared. Okay, then maybe I'm confused. I think that, yes, I think we would be okay with that. I think our concern would be more if there were a more general holding that bids are rates that could create all sorts of consequences. Well, then, if you're only concerned about the consequences and the consequences are indistinguishable here, why should we worry about it? What is the – how do we go about characterizing this number that gets assessed under the normal 205 standard as a rate since it's being, according to you, evaluated a rate would be? I just don't know if that's true in all cases. It's true here, but I don't know. I just hesitate to – I can't agree that bids are the same as rates and subject to 205 in all circumstances. Well, I know. That was very clear in your brief. Right. No, I certainly couldn't be able to do that, but I do think that we're not – I think that we're all in agreement about how the supplier bid should be treated if it is – you know, if it is compliant with the tariff and supportive of documentation. I don't think, given paragraph 18, that we're disagreeing, that the supplier bid would be accepted instead of the mitigated bid in that circumstance. Your argument on the broader point, I assume, has to be that everything we're talking about now, in the words of 205, involves rules and regulations affecting or pertaining to such rates, and you happen to treat aspects of this as if they were rates even though your position is they're not. Right. They're not rates within the meaning of the first line of this provision. I think that's right. Yeah. Well, I just – there are so many bids into options that are set up with market rules that I just – Understood. Yeah. Anything else? Thank you. Thank you.
judges: Katsas, Silberman, Williams